Good morning, Illinois Appellate Court First District Court is now in session, the fourth division, the Honorable Justice Jesse G. Reyes presiding, case number 20-1107 consolidated with 21-0753 NRAD Commitment of Johnny Butler. Thank you, Mr. Schaffer. Good morning, councils. Apologize for the delay. We had some technical difficulties starting this morning, but we're ready to proceed with councils who are going to be arguing this morning. Please identify yourselves for the record, and also what party you're representing. Good morning, Your Honors. Ian Barnes on behalf of the appellant Johnny Butler. Good morning, Your Honors. Eldad Malamuth from the Illinois Attorney General's Office on behalf of the people. Okay, so 15 minutes of peace, councils. Mr. Barnes, you want to reserve some time for rebuttal? Please, Your Honor, I think four minutes would be sufficient if that's if that's acceptable to the court. Four minutes. Okay. All right. You ready to proceed, Mr. Barnes? I am, Your Honor. Thank you. Your Honors, may it please the court and my colleague from the state. Mr. Butler comes before this court today with a very simple request, and that is simply that he have the opportunity to have an evidentiary hearing at which he can present evidence. In the 11 years since his commitment, despite a positive behavioral record, and despite a significant 10 years of treatment, he has never had an evaluator appointed for him, and he has never had an evidentiary hearing to determine his current status. For the last decade, the trial court has heard from one side from the DHS evaluator year after year, and this court should now hold today that the trial court should hear from both sides. This morning, I'd like to address first the issue of probable cause and from there move to the issue of the denial of Mr. Butler's motion to appoint Dr. Abbott. Turning to the former, reviewing de novo, this court should hold that there is probable cause, that there is a plausible account for an evidentiary hearing, namely in that there's a plausible account that Mr. Butler has made sufficient progress for conditional release, or a plausible account that he is no longer an SVP. In the last 11 years there have been numerous identifiable changes that support that finding, and I'd like to go through, those are all enumerated in the briefing, but I'd like to go through some of them just to highlight, I apologize. Just to highlight the breadth of what has changed. I'm deeply sorry. Starting with the risk assessment, Mr. Butler, if we look to the static 99 scores for his case, in the time since his trial, since 2011, the recidivism estimates for someone with his scores have plummeted from 37.9% to 15.2%. Now those are significant all on their own, but they're also significant, excuse me, significant because they don't account for a couple things. They don't account for treatment. They don't account for the decade of treatment that Mr. Butler has been doing in the TDF, and TDF staff regard him as someone who's an active and meaningful participant. They regard him as a model for resident behavior, and even Dr. Swear has acknowledged that Mr. Butler is someone who is genuinely motivated to change his behavior, rather than... Let me ask you this, counsel, what should the role of the static 99 be in evaluating potentially sexually violent individuals? Well, Your Honor, it's incredibly significant because if we look at Dr. Swear's risk assessment, those recidivism statistics are really the only objective thing we have. Something like reliance on dynamic risk factors that can't be quantified or categorical risk levels such as above average risk, those really don't provide us with anything objective. But the absolute recidivism statistics do. They tell us if we look at a sample of people who are similarly situated to Mr. Butler with a similar criminal history, similar past, what rates are they reoffending at? And those statistics show that the rates are very low, and they are drastically different from what they were at the time of his commitment during trial. And that is to say what the jury heard when he was initially committed. Lawrence, can I interrupt you for a second? I'm concerned, and I can't remember the name of him right now, because the case I just heard is in my head. But there are five levels of treatment, and it seems like the last two are important in terms of him going back out into the community. And it looks like he's had three years to get through those last two levels, and he's still in level three. That concerns me, because I believe those last two levels are important to him being considered for release. Why hasn't he completed those two levels in the last three years? Well, Your Honor, I think the simple answer is everyone goes at their own individual speed. They progress through the treatment as they are able to do. Mr. Butler, while he is in phase three, he routinely is praised by Dr. Swear, who ultimately ends up rendering unfavorable opinions. But he praises Mr. Butler's efforts, his motivation, his desire to change. And I think it's important to note that there is no required level of treatment. There is no magic number that says this person is ready for conditional release or this person is no longer an STP. I'm sorry, but now it came into my head. Isn't the fourth level like relapse prevention? And the next one, how you do when you're in the community that he has not addressed, which would, I mean, I'm not going to be around the University of Chicago. But if I were a citizen and heard the guy didn't have a relapse prevention plan or what is a good something reentry, it would frighten me as a citizen that he had not had those treatments yet. Well, your honor, I think one one thing to keep in mind that is important and significant is that in his reports, Dr. Swear has said Mr. Butler doesn't have a relapse prevention plan, but he has not specified why Mr. Butler can't do that in the community, why that can't be worked on in the community, particularly in the context of his disciplinary record at the facility, which in the past few years has been immaculate. This is someone who, as I said before, the TDF regards as a model for resident behavior. So that is one factor here. But we also have to look at this globally in terms of everything, his treatment, his age, what his risk assessment is like. And for someone like Mr. Butler, as I said, the treatment that he does isn't reflected on the static 99 scores, which already reflect a very low risk of recidivism. But they also don't reflect his age beyond the age of 60. He turned 60, I believe in 2013, he will be 69 next month. And the static 99 stops accounting for age at 60. But we know from the record in this case that there is research that says there is an annual two to 4% decrease in risk year over year that these instruments aren't necessarily accounting for. Let me ask you this. So you indicate that, you know, he's in his 60s, and he entered the 60s in 2013, right? That's right. Okay. What about these incidences of battery that he was cited for in 2017 and 2018? I mean, that seems to imply that he's still not able to play well with others. Well, no, Your Honor, I disagree with that for a couple of reasons. The first thing is what we're talking about in this case is the risk of sexual recidivism, not simply what's his risk of fighting, but also those took place before he was advanced to Phase 3. Since he's been in Phase 3, the record doesn't indicate there have been any incidents like that since. So what that says, I think, for the court is that the treatment is working, that as he is going through this program and working to recondition his behavior, it is being successful. How long has he been in Phase 3? I believe since early 2018, Your Honor. Okay. But I might be mistaken. It was sometime in 2018, but I might be mistaken as to exactly when that was. And we can also, in terms of... But hostility is, you know, aside from A, just being a not, you're arguing it's a non-risk factor here, but there are other risk factors, you know, I think hostility and a couple other things that Dr. Suri mentioned. So those incidents that took place in 2017 and 2018 go to the hostility factor, don't they? Well, not in terms of what his current behavior is like, Your Honor. What his current behavior is like has been exceptional. And it's important to note that when, and this goes directly to the issue of probable cause as well, that when Dr. Swear assigns these risk factors, he doesn't establish any current evidence to go along with them. These are the same risk factors that he assigned to Mr. Butler at his trial in 2011, and as he sits today, he doesn't cite any current evidence to support them. And if I could, just one last thing I want to touch on in terms of probable cause is lack of current evidence of other specified paraphilic disorder or non-consent. Dr. Swear certainly gives him this diagnosis, but doesn't cite to any current evidence that would support it. So when we're looking at is there a plausible account, and that's without weighing the evidence, without weighing these facts, without drawing inferences one way or the other, without doing any fact finding or weighing credibility, is there a plausible account that he has made enough progress for conditional release or that he is no longer a sexually violent person? And I would submit that the answer is yes, there is a plausible account. His risk is significantly lower. He's done a decade of treatment. There is additional research that goes to undermine things that Dr. Swear has relied on in his report. At the end of the day, your honors, what Mr. Butler is asking for is a hearing. He's asking for an opportunity to be heard. He's not asking this court to discharge him. He's not asking this court to order his conditional release. He's asking to be heard. So on this subject, I would ask this court to reverse and remand for an evidentiary hearing on the topic of conditional release or discharge. And that moves me to the motion to appoint Dr. Abbott, because at that hearing, he's going to require evidence. He's going to require the ability to put on a case. And we know from the Lawson case out of the Supreme Court that the burden that Mr. Butler must clear to be entitled to an independent evaluator is a low one. In that case... Let me ask you this. From the record, it appears that his last sexual offense was committed when he was in his 40s. And he's now, he's been incarcerated since then, and he's in his 60s. So how is this evidence going to be presented? Who's going to present this evidence? I mean, there doesn't appear to have any link between the last sexual act that was in his 40s to the present. Your honor, I apologize. I'm not sure I understand your question when you say who's going to present this evidence. Which evidence are you... Well, you're saying that you need to present evidence, but where's the evidence? How is Dr. Abbott's assessment going to be any different than Dr. Sears since, you know, he's been incarcerated since he's been in his 40s? Well, the evidence we're talking about, your honor, is opinion evidence in terms of does Mr. Butler continue to suffer from mental disorder? How does his progress in treatment affect his likelihood to reoffend and whether that means he should be placed on conditional release? How has his risk changed over the last decade? That's the evidence we're talking about. And when I was discussing probable cause and all these things that support it, those are all things that are... I'm identifying facts and I'm putting it into argument, but that of course is not evidence. And what Mr. Butler needs is a witness who can explain to the trier of fact why those are significant. What is the significance of the fact that his actuarial instrument scores reflect a 15.2% chance of recidivism versus 37%? What's the significance? Has Dr. Abbott examined Mr. Butler? No. And I'm glad you asked that because in the briefing in this case, the state has tried to turn this issue into one of Mr. Butler having a burden of persuasion, that he has to show how Dr. Abbott would change things, how Dr. Swear is wrong, and that is simply not the law. The standard is, is Dr. Abbott necessary to prove a crucial issue in this case? And in these cases, in SVP cases, the crucial issues are really twofold. Does Mr. Butler have a mental disorder and what is his risk? And everything that Mr. Butler identified in his motions to appoint Dr. Abbott, problems with Dr. Swear's report, how Dr. Abbott might rebut those things, those all go to those two issues. But Mr. Butler can't possibly show how Dr. Abbott would change the outcome of this case before he's been appointed, before he's done a report, before he's given one sentence of testimony. That would be an impossible standard to me. That would mean no indigent person could ever obtain relief and or relief in the sense of getting an independent evaluator. And that's really what Lawson says. In that case, the defendants counsel asked for a forensic expert to examine the forensic evidence, advise counsel and testify at trial. And the Supreme Court said that's good enough. That's a good enough showing. And we can really contrast that with the Batrov case, which is plainly distinguishable from Mr. Butler's case, where the trial court asked the respondents counsel, do you have any comments or argument regarding the evaluators report? He said no, asked for an evaluator anyway. And the Supreme Court said this is clearly a situation where this person did not have a need for an evaluator. And Mr. Butler's case goes far in the other direction, in line with Lawson. And it's worth noting that two years in a row, Dr. Swear opined that Mr. Butler was close to being ready for CR. In 2020, he said, Mr. Butler might make progress in the next year to be ready for CR. In 2021, he said, Mr. Butler might have made enough progress, but for the restrictions that ensued from COVID-19. So when the legislature gives respondents the right to ask for an independent evaluator, there isn't a better case to warrant one than a close case like this, where the DHS evaluator is already saying this is a close call. All right, counsel, you reserved four minutes for rebuttal. You want to sum up at this point? Sure, please. Thank you. What Mr. Butler is asking for, your honors, are the raw materials to simply present a defense. He's asking for the opportunity to be heard. And he's asking for the opportunity for the court to be able to hear from someone other than the machine of the state. And he wants to be able to participate in the adversarial process fully. That is what he's asking for. And that is it. So accordingly, I would ask this court to reverse the judgment of the circuit court, remand for an evidentiary hearing, and order that that hearing take place with the assistance of Dr. Abbott. Thank you. Thank you. Counsel? May it please the court and counsel. Once again, I'm Assistant Attorney General Eldad Malamud on behalf of the people. Unless your honors wish otherwise, I will follow the pattern of respondent's counsel and address the probable cause issue first, and then the issue of the appointment of the Dr. Abbott, excuse me, as the expert. Turning to the probable cause issue. First, it is important to clarify that because respondent withdrew his petitions for discharge, the probable cause analysis is limited to review of the reexamination reports from Dr. Swear and the arguments on behalf of the parties. So we'll turn to those reports and those arguments and to what counsel, how counsel believes that, how respondent believes that probable cause has been shown. First, he discusses his progress in treatment. But as your honor has already recognized, he's only in the third phase of a five phase program. That means he's only completed two of the phases. As your honor pointed out, he has no relapse prevention plan. That's a plan which is to combat the risk factors in his behavior. He has no good lives plan, which is a plan to attain, where he develops a plan to attain his emotional needs in appropriate ways. So he's only on phase three of the treatment. That is the self-application phase. And that's when residents only begin to use the basic model to examine their offending and non-offending behaviors. He hasn't even reached incorporation, where residents are expected to actually use and support their efforts to use their plan in their self-identified interventions. And he certainly hasn't reached phase five, which is transition, where he works on integrating himself into the community. So there's no probable cause demonstrated by only reaching the third phase of the five phase program. Then, again, we look at his conduct in the treatment and his conduct in the facility and respond in a search that because he has only had disciplinary issues in 2017 and 2018 for fighting and for battery, that this somehow demonstrates that he has shown probable cause, that he is no longer substantially likely to reoffend. But that is contrary to Dr. Swear's report. Dr. Swear notes that it is atypical for someone in their 60s to still have these sorts of disciplinary issues. And instead, what it demonstrates is that these dynamic risk factors, which Dr. Swear has highlighted, still apply. As your honor noted, there's hostility. There's also antisocial personality disorder. So we have these dynamic risk factors that apply. And indeed, his behavior in the treatment facility, only progressing to phase three and continuing to have disciplinary issues, does not establish probable cause. That is Dr. Swear's conclusion. With respect to the issue of current evidence for his diagnosis for other specified paraphilia non-consent, as your honor pointed out, he has been either incarcerated or in the facility since he committed his last offense. And so the idea that there needs to be some sort of evidence that he still has the disorder from the last year, from the last reevaluation report, is simply not the standard. We look at whether the circumstances have changed since the last reevaluation, reexamination report. And the circumstances have not changed. He still has committed sex offenses, sexually violent offenses over decades, from when the time he was 22 in 1975, again in 1980, in his late 20s, again in his 40s, when he's in 1997. And so we have this pattern over decades. And we have, again, his admission in treatment, which is another point with respect to his treatment, his admission and treatment that he had actually committed many more offenses. He kept raising his estimates from one more offense to five to 15 or 17. So the information we've obtained in his treatment doesn't establish probable cause. It only supports Dr. Swear's diagnosis that he has the mental disorder and that he's substantially likely to reoffend. With respect to training. I'm sorry, if I could, is the diagnosis in the 2020 and 2021 report different than the diagnosis at the original trial in, what was it, 2008? No, Your Honor. The diagnosis is the same. The terminology. It's essentially the acronym has changed from it is currently the OSPD, Other Specified Paraphilic Disorder Non-Consent. It used to be Non-Specified Other Paraphilic and POS Consent. So it's essentially just the terminology. It's the same diagnosis. It's the same diagnosis. Correct, Your Honor. And the DSM just changed it. Exactly. Exactly. Yeah, just the acronym has changed. The diagnosis has not. And that's been an issue that has also been litigated in the courts about whether that was a meaningful change or not. And it's been concluded that it's not. So, but getting back to the OSPD Diagnosis Council, Mr. Butler's argument in the briefs and here today appear to be that we shouldn't give it any validity though. Well, that's exactly right, Your Honor. So turning to and what's first important to note is that's not a proper consideration in the analysis of whether there is probable cause. Again, probable cause determination because he withdrew his petition for discharge is simply limited to Dr. Swear's report and argument. And what respondent cites for the idea that this diagnosis is no longer valid is outside those materials. So it's not even relevant to the probable cause determination. What it is relevant to, however, is the issue of whether Dr. Abbott should, whether the trial court should have appointed an expert, being Dr. Abbott, to discuss this matter. Now, again, the trial court had discretion in this regard. So we have to find that the trial court's decision was arbitrary or fanciful that no reasonable person would have reached this decision. Now, respondent has provided an article or various materials in which he asserts demonstrate that the OSPD is no longer a valid diagnosis. But the Illinois Supreme Court has clarified that this is not the proper subject of the probable cause hearing. In Stanbridge, the Illinois Supreme Court made clear that the only proper issue before the court was whether there was a probable account of changed circumstances such that he no longer has the mental disorder for which he was already adjudicated. The Stanbridge court clarified that an expert's evidence of an acknowledged debate in the medical community is not evidence of changed circumstances. And in Stanbridge, this involved one of the respondents, Lieberman, and in fact, he had been diagnosed. In that case, the disorder there was the same disorder. It was the OSPD, it was the non-consent, using the terminology that existed back then. So this question of whether this diagnosis is valid has been going on for many years. Stanbridge is a 2012 case. In that case, the Illinois Supreme Court already discussed that they should be going on for many years. And so the question of whether OSPD is a valid diagnosis is not the subject for the probable cause hearing. So pointing Dr. Abbott to discuss, to provide testimony that it's not a valid diagnosis does not meet the proper test. Respondent has not shown that it's necessary to establish a crucial issue in this case. So we can set aside Dr. Abbott's testimony, proposed testimony about the validity of OSPD. Separately, we have Dr. Abbott's proposed testimony about the static 99R. And now, so this is the second category of which Dr. Abbott would have testified according to respondent. But once again, we can look to the trial court's determination and find that the trial court was not arbitrary or fanciful in determining that Dr. Abbott's proposed testimony about the static 99R and the recidivism rates would have yielded a different outcome. Now, respondent suggests that the idea that he had to show that the court might have ruled differently is some sort of distortion of the case law, but that's simply a quote from Boutroff. Boutroff said that it affirmed the denial of the expert, specifically reasoning that there had been no demonstration that the court would have ruled differently. And so we look to the static 99R testimony that Dr. Abbott would have given. And essentially, he argues that he would deviate from the static 99R. So the static 99R is the sort of accepted method of analysis. And Dr. Abbott asserts that he would assess the statistics differently. So he wouldn't assess. He concedes and responded to that the static 99R demonstrates that he would have a 15% recidivism rate because he scored a 5 in the static 99R. That's above average risk, 2.7 times higher. But he says, no, I would look at the stats differently. And the way I would assess it, there wouldn't be a 15% chance, there would only be an 11% chance is how he, the number he uses. But the trial court was reasonable in saying, look, that doesn't matter whether there's a 15% recidivism rate or an 11% recidivism rate, I'm looking at this particular respondent. And I'm determining that this respondent who has committed crimes well into his 40s, when the recidivism rate has already dropped mostly. So generally speaking, the recidivism rate drops also when people reach the 40s. That was not the case for this respondent. He committed not just one, we believe, but many more offenses at this point. And so the recidivism rates, although it drops in general, he still committed his crimes. This respondent committed disciplinary violations well into his 60s. That's atypical. Dr. Swear further pointed out that the stats, these recidivism rates, don't apply. When we look at the numbers, they actually don't apply to sex offenders who have been convicted of multiple offenses over many years. Sure, there's a general recidivism decrease for sex offenders, but that's for all sex offenders, whether they were committed of one crime or 10 crimes, whether they did this once in their 20s, or whether they did it in their 20s and 40s again and again. And that looking at all these things, looking at his lack of progress in treatment, looking at these numbers, looking at just the picture as a whole, this particular respondent that Dr. Abbott's quibbles with the generally accepted static 99 numbers would not have made a difference in this case. That was not an unreasonable determination. And because the trial court had the discretion to view it that way, this court should affirm that judgment. So unless I believe I'm running low on time. Unless, unless your honors have any questions, we would ask the court to affirm the judgment of the trial court. Any questions. I just have a procedural question because if I understood. Mr Barnes request that we should reverse the order denying the motion to have Dr. Abbott appointed and then order in order a hearing. If we were to find that the motion to for to appoint Dr. Abbott should have been granted. Does that automatically lead to a conclusion that there should be a hearing or would there be a step in between for the trial court to take. No, Your Honor, the, I believe, or rather you're correct Your Honor. The there's an additional step. So the, it goes to an evidentiary hearing, if there's been a determination, finding a probable cause. If there's simply an independent evaluator pointed in the independent evaluator could conduct that evaluation at which point, there would be the probable cause hearing, which would then at least could then determine whether there's actually an evidentiary hearing. I believe those are the how the procedure would would go depending on the corridor reverse on that ground and not the probable cause. Okay, I think that's probably what Mr. Burns was actually saying, but thank you for that. All right, well I have one question that's a hypothetical was determining whether if we were to grant an evidentiary hearing, which would lead maybe possibly to Mr Butler's conditional release. Could he still complete his treatment, when released. Your Honor, there can be additional treatments. When the offenders on conditional release. Treatment can continue, but obviously be different form of treatments that you might not be exactly the same but but the treatments that some form of treatment can continue. Yes. Okay, great. Thank you. One additional. Yeah, I just had one question. What other other than these. I think it's for at least sexual assault convictions that he's had and misdemeanor batteries. What is this other background, I, I would like to know if either of you have it. issues of violence, not just not something just like that, but I think just slam can froze there. Well, I will. I don't want to interrupt Justice Lampkin but doctors, just like can you froze there for a bit. Did you repeat your question. I, I think Justice Lampkin is still frozen, but if, if you have his criminal background, I think that's what Justice Lampkin was asking about your honor, Dr. Swear and his original trial testimony did address respondents non sexual criminal history. This, you can find on page 638 of the report of proceedings. And it does address respondents early involvement in gang activity, various truancy fighting armed robbery. And then discusses how as an adult he had spent basically his entire life in prison under court supervision in which case, he still did have further disciplinary actions that involved violence. Okay. All right, I think we lost Justice Lampkin but I know that she will listen to the rest of the oral arguments on the tape. So anything else Mr. Melmoth. No, your honors and unless the court has further questions, we would ask the court to affirm the judgment of the trap. Just right for any other questions. No, thank you. Okay. Mr Barnes rebuttal. Thank you, Your Honor. The first thing I wanted to touch on was Justice Reyes your question about whether Mr Butler would be having treatment in the community if he was on conditional release. I believe the state said that treatment can continue. I think that understates the issue a little bit. Part of being on conditional release is that treatment is mandatory it is required that people continue to go to treatment, while they are on conditional release. I think the state's argument offers a couple interesting pieces of dissonance that I wanted to talk about. The first one is that the state said that the offers of proof that Mr Butler made in the trial court weren't properly before the court. They were, they were outside of the, the reports and argument. And, of course, the state's position is also that Mr Butler is not entitled to an evaluator. This presents something of a conundrum because if the DHS evaluator fails to consider new research or new methodology or new anything, anything that's left out of their report. And Mr Butler is not allowed to bring that to the court's attention by way of an offer of proof, or his own evaluator than the DHS evaluator and the state is effectively immunized from any of those changes. And that simply cannot be the case. The other thing is in the trial court in 2020 and in 2021, the state insisted that the trial court should be looking at only the most recent examination series, only the most recent year. And now today, the state, and in its brief has said, we shouldn't be looking at this most recent stuff. If we look at the last few years where his disciplinary record has been immaculate, we shouldn't look at that we should look at what happened before. Same with the lack of evidence of OSPD. We shouldn't look at that, we should look at his history of convictions from decades ago. It's, it's essentially a, please don't look at the man behind the curtain, please only consider what is least favorable to Mr Butler and Rendon that the 2017 Rendon opinion is clear that the appellate court can consider his history, it can consider the most recent year it can consider everything and that's what the sport should do. I also wanted to touch on this idea that the, the lack of evidence of a disorder is somehow not properly considered. One of the changes that the Supreme Court has identified that can support probable cause. The list is changes in the committed person changes in professional knowledge and changes in legal definitions, the lack of evidence and the issue of how reliable OSPD non consent is as a diagnosis, really go to two of those three things, changes in Mr Butler and that there isn't current evidence and changes in professional knowledge, and that this research that was proffered in these motions to appoint Dr Abbott was from 2018. Mr Butler's commitment trial was in 2011, this information simply did not exist in 2011. And there's no telling how a trier effect would weigh that now. And the last thing I want to touch on is from the state's argument. There was really a vein running through it that was Dr swears correct. Dr Abbott is wrong. And that is not a question for probable cause, whether Dr Abbott is right, whether the state agrees or disagrees with the methodologies he uses is not proper for a probable cause hearing. Those are proper considerations for an evidentiary hearing which obviously Mr Butler would welcome. At this stage, we should not be weighing inferences, we should not be weighing competing facts, and we should not be determining credibility. So when Dr Abbott has these proffers of how he would evaluate Mr Butler's risk, or what is wrong with Dr swears report. We're not asking this court to decide who's right and who's wrong. We're simply asking for a hearing at which a trier effect can determine who is right and wrong. So unless your honors have no further questions, I have nothing else, and I would ask this court to reverse the judgment of the trial court and remand for an evidentiary hearing, and the appointment of Dr Abbott. Any questions from the panel. I don't know if the question that I asked was answered when I got kicked off so if it was, I can listen to the tape or if somebody can tell me very quickly I really would appreciate it. I mean I know he has the for violence convictions I've read that he estimated that he had at least 17 other sexual attacks but I was wondering what is other background was that the judge was able to see. Mr Barnes you have any objections Mr moments, I respond to the question. I don't care. Okay, Mr mamas. Thank you, Your Honor. Justice Lampkin. The doctor swear did review the other history. This is on page. referred to on page seven of our brief says in the original trials can be found page 638 of the report of proceedings. And, as did Dr ransom, and they, they addressed how respondents had been involved in gang activity, a very young age, and that had evolved into truancy and fighting and armed robbery. And then as an adult, had that he had been essentially spent his entire life in prison or under some sort of supervision. And then had the disciplinary infractions, either in prison, or at the current facility. Thank you. Barnes anything with regards to that. No, Your Honor. Thank you. Okay. Does the panel have any other questions for us. Okay. I want to thank councils for this very interesting case with interesting issues. We'll take it under advisement and be rendering a decision shortly. With that, the court is adjourned.